The case this morning is 4-1-0-0-1-5-9, in re. T.G. For the appellant, Mr. Novick, for the appellee, Mr. Manchin, you may proceed. May it please the court, counsel, I'm going to try to make my first line, rather my last line, my first line. If any of the arguments or suggestions I make before you today ring true, you can tell, you can take judicial notice by the posture of the case that we're about 90 days away from this child being placed for one year. And at one year, this child, the foster parents to this child have an absolute preference for adoption. They announce their intent to adopt, and so I just wanted to start there. I've suggested two reasons to the court. Keep your voice up a little bit. I'm sorry, I apologize. That's not a microphone. That just records. I apologize. I suggested two reasons to the court why the trial court erred in fashioning its dispositional order. The first was that there was, in this particular case, not a sufficient reason to find that it was in the minor's best interest to be made a ward of the court. And secondly, even if you found that it was, the dispositional order could have been fashioned differently and the grandmother could still have been made the custodian of the child. This is clearly not your run-of-the-mill abuse-neglect case. First of all, it's dependency, and the facts of the case are about as heartbreaking as one could have. And the reason I point that out at the outset is because in virtually every juvenile case you see, the parent coming before you, seeking return of the child, is in part responsible for the child being there. Obviously, that's not the situation here. Judy Stockville's only reason for being here is that she's a grandmother, and I believe the evidence did show an exemplary one. The policy of the juvenile court is clear. We are here to preserve the minor's family ties whenever possible. If there's a relative ready, willing, and able to care for the child, that person should be given due consideration. Ms. Stockville filed a petition to intervene. She filed a supplemental petition suggesting some relief to the trial court. And so she was in the right posture, I believe. There is case law support for outright guardianship to a relative in this kind of a situation. I cited two cases to the court, the C.L. case and the John C.M. case, and both of those stand for the proposition that a fit parent, in this case a fit grandparent, who doesn't need supervision of the department, we don't need the wardship of the court. This child can go directly to that person. As a practical matter, grandma was a whole lot closer to the services that T.G. needed than where DCFS placed the child. Grandma living in Lincoln, the services were in Bloomington. It's a 45-minute ride down 55. The child was placed in Piper City a couple hours away. This child needed physical therapy. She needed occupational therapy. She needed speech therapy. She needed counseling. And so we are taking this child down the road a great deal of her time. It just didn't make practical sense to me. We tried to point that out. In addition, grandma was a licensed clinical social worker. She worked as a psychiatric counselor, and she was precisely trained to deal with the kinds of losses that this poor child suffered. She'd been doing it for decades. She had cut back on her hours in past years to spend more time with the family. There was testimony that she spent a great deal of time with Austin, who was the next oldest child to T.G., and took Austin home many weekends. Austin was part of the tragedy in this case. At the dispositional hearing slash hearing on the supplemental petition, monetary factors were an issue. As I recall, the statute says in general we don't have worship for kids for financial reasons alone. And both the assistant state's attorney commented on that. Even with the financial woes of the state of Illinois, DCFS has the resources to provide for this child. And Judge Feeney, I think his heart was in the right place when he said, yes, DCFS has the resources to provide for all these services. His heart was in the right place, but I'm not sure that's what the child's best interests were. Ms. Stockdale had the education, training, and experience. The evidence was clear. She had extreme familiarity with this child, spent all holidays with her. There was a family garden in her yard where T.G. and T.G.'s family, when they were alive, came to garden. There was a basketball hoop, and there were bicycles, and there were swings. This lady had a tremendous familiarity with this child. She was bonded to her, and the child was bonded to her grandma. That was testified to by one of the witnesses at the dispositional hearing. This was Austin's teacher, and then she became T.G.'s teacher. Didn't have T.G. that long because this tragedy intervened. But she visited in the hospital, and what did she see? She sees a bond between grandma and the child. They're talking together. They're painting. This was before. This was when the doctors said, oh, this is the grandma. This child needs a new grandma. The social workers took over, and that ended. After the tragedy, it was the doctors who let Ms. Stockdale visit without supervision, and then the social workers intervened. She had the desire and a flexible schedule, and given the parents you see, you don't see, but you read about in juvenile court, some of the horrible examples of parenting, those kids would love to have a grandma like Judy Stockdale take care of them, to advocate for them. Who was it who decided, and when was it the decision made, to release the child to the foster parents? The decision was made about a month after the tragedy by DCFS, as the child is being released. Right after the tragedy, I wasn't there, but I suspect Ms. Stockdale had a problem in the sense that her son, her daughter-in-law, and three of her grandchildren were murdered. At that very moment, maybe she wasn't the best person to place this child with. But the child's in the hospital for a month, and by the time the child is out, Ms. Stockdale has her petition to intervene on file. She has her supplemental petition on file, and to the extent she can recover from this kind of tragedy, she's recovered. Your Honors, our fallback position is, if you were to decide that Judy Stockdale was an appropriate caretaker, but still needed some supervision by the department, still the best interests of the child were such that DCFS needed to be involved, that can occur. She could still be the custodian. How did the child not get rewarded to somebody other than her? Well, I'll let Mr. Manchin handle it. All I can say is that the child was placed with the foster parent and denied visitation with the rest of the family almost exclusively. There was very little visitation. The child is then sent to a counselor who never meets Grandma. By the way, the foster parents had never met the child. The child is sent to the counselor, and the counselor goes, well, looks like the child's doing pretty good. Considering what happened, the child's doing pretty good. Leave the child there. The counselor never saw the child with Grandma. The counselor never asked. The counselor never asked the foster parents, had you ever met this child before? We're at a posture in the case where we've already had a permanency hearing pending this appeal. There's a resume, I believe, for the counselor. It's either in your file or it's not. But if it's there, you'll be able to see the level of experience. If it's not, then one of the questions you could ask is, you know, the trial judge, we defer to his findings of credibility. Counselor never testified. We get dispo report and counseling report just before the hearing. We're under a gag order. We're not allowed to see anything. I never saw the IA before the dispositional hearing. Counselor's name is blocked out. They don't call her. I couldn't have called her. I didn't know who she was. We're asking you to. Let me. I thought I understood that the foster mother had a long-term relationship with the child's family and that some of that related to marriage or whatever. And also the foster parent or the foster mother visited the child in the hospital. Okay. The latter suggestion is absolutely correct. The first suggestion, Your Honor, was but not for the last 12 years. Okay. But knew the family. Clearly knew the family. But you said she'd never met the child. You mean she'd never met the child before she visited her in the hospital? Right. There's a couple of reasons why I believe the case work in our factual situation was lacking. I'll talk about that first before I go back to the foster parent for a minute. When Ms. Stockdale testified at the dispositional hearing, given her decades of experience counseling children like this, the state or the GIL asked her, Well, you don't seem to like this counseling report. You don't seem to like what's going on. And she responded, Well, I've been kept out of the loop. I was told by the DCFS supervisor, You don't need to know that she's in counseling. And when she reads the report, it's a little unclear to her as to where they got information about the child. Her position as a counselor with years of experience is, The child can't always tell you what's going on. She's only four years old at the time. You talk to the people that know her. Now, at that time, that was the suggestion I made to Judge Feeney. I said, Judge, I don't think we can rely upon the counselor and the casework in this case because no one ever talked to Grandma. And then as I was preparing the appeal, I looked at the DCFS rules. I looked at the integrated assessment rules. I looked at the DCFS procedure. The testimony of Grandma parrots the DCFS rule and procedure. You need a baseline on this child. You need to talk to people who knew the child. Who does DCFS talk to? Nobody that knows the child. They gather some school records and they make some assumptions and they begin to counsel the child. I suppose it's better than nothing, but wouldn't it make sense to talk to the lady who spent every holiday with this child? Wouldn't it make sense to talk to the lady who had health care for this child, who was actually present when the child was born? And so I'm inviting the Court to take a look at the appendix to the brief. It's a little dry. It's DCFS rules, but the integrated assessment is a comprehensive and specific procedure as to how we go about the process, and DCFS didn't bother with it. Let me ask you a question. Other than the Grandma, are there relatives in the nearby area, in the Lincoln-Beeson area, that also would have had information about the child and the child's interaction with the family and the grandmother that would have been available? Yes, Your Honor. Were they interviewed by DCFS? They were not. One other person petitioned to intervene in the trial court, that was a lady by the name of Nicole. She would have been an older sister, essentially, an adult sister with her own children, and Judge Feeney found that she would not be allowed to intervene, but she was available and, yes, she had knowledge of his child. And she had an interest in the child? I believe so, Your Honor. Since she didn't intervene, we don't know what the level of... I mean, there wasn't any evidentiary basis for knowing what the level of contact was with the child. I think she did testify at her own... At her own intervention hearing? Yes, Your Honor. And give me a... I think she knew the child fairly well. I think her daughter knew the child fairly well. They were buddies, and that was another reason, that would have been another alternative placement. But the record before us would show that that... There wouldn't be any record to show that DCFS talked to her. It's not in the IA. And the IA is the place that we gather the information and use that to create the service plan for the child. Did DCFS oppose the intervention of that relative or take no position? If you remember. I don't remember, Your Honor. Okay. Thank you. Who are the people who have been charged with this crime? They are... That was the issue, Judge. One of the people charged with the crime is the ex-husband of Nicole. And his brother. But that would relate to the intervention of Nicole. Yes, Your Honor. Nothing to do with grandma. And when you say nothing to do with, you mean nothing to do with biologically? Correct. Nothing to do with by marriage? Correct. Nothing to do with by interaction? Not even sure. Right. I realize that I've got a tough road to hoe. And that is, you have to find that the best interest of the child were not served. It would be against the manifest weight of the evidence that the best interest of the child were not served. But I think I've tried to show that by showing you that the department promulgated their own rules. Counsel, let me ask you this. We can't turn back the clock. Maybe you have a good point that DCFS should have handled this differently back in October, November, or December. This is now July, six months, seven months later, in the lifetime of a four-year-old who's undergone, as you correctly described it, a terrible experience. The good news seems to be that she is responding about as well as one could possibly have hoped to all this. At this point, how can we conclude that it's in her best interest to change custodians? We have a very fit, competent person who knows the child well who happens to be her grandmother. I don't see any reason why this court couldn't decide that the trial court just made a mistake and there was no need for guardianship and this case gets shipped back and this child goes to grandma and we all live happily ever after. If you have any concern about the intervening time... You haven't answered my question. I know we can't turn back the clock. My question is how can we decide that that would be in the best interest of the child today or next week? By looking at the best interest factors and deciding that given the testimony in the record right now, this child's identity is important. This child's identity is important and it's in her best interest to be with her grandmother. She has significant background and ties, cultural and familiar, to grandmother. She has a sense of attachment to grandmother. The child actually feels love with grandmother. We've done a permanency hearing since then. If you have any doubt about that those factors are not present, send it back because I know what those factors are going to come out in the trial court. How did Easter Seals get involved in this? I'm sorry, Your Honor. How did Easter Seals get involved in this? Easter Seals provides occupational and physical therapy to this child. And was what they had to say in their report, was that important? I think, once again, we have a situation where this child is taken away. Most of her family is murdered. The grandma who would like to be there is not allowed to be there. She's placed with a foster parent. Easter Seals goes, looks like she's doing pretty good with the foster parent to me. She would have bonded with anybody at this point, Judge, had nothing. I think the child, in this case, is exceptionally fortunate to have two different sets of people who are very, very good. Yes, Your Honor. I'm not sure I have any other questions. Unless there's any other questions. I guess the only other thing I would say is that I looked for cases that actually dealt with this issue, found nothing, found that Arizona case. I think the Arizona case is instructive because the Arizona Supreme Court seemed to be saying the same kinds of things that our Juvenile Court Act says. And that is, we are here to strengthen family ties whenever possible. The Arizona Supreme Court said, unless something unusual is going on, a grandparent should certainly be given a long, hard look at taking care of a grandchild in a dependency situation when her parents are no longer with us. By the way, you mentioned in response to my question something about, I'm trying to recall how you put it, but when I asked about who the people were charged with this, as if there was some sort of connection or concern that DCFS and others had. Do you recall? What were you getting at there, Mr. Novak? I don't think any of this is in the record, Your Honor, but what I'm getting at is we have a person accused of murder whose ex-spouse could conceivably be considered as a placement for this trial. And there's a murder trial that's going to occur. And I don't know if the Attorney General is going to call the child as a witness or try to get more information from the child. But was there a concern? Yes. But that concern related to the other person that you mentioned. Just Nicole, Your Honor. So I'm interested in whether there's any spillover to grandmother. No. Did she have any relationship with the people accused of this crime or their relatives? No. How do you know? There's nothing in the record, and there's nothing I know from personal knowledge. No one from DCFS ever expressed these concerns? Never. Did the trial court ever address it? Never. Only as to Nicole. The guardian ad litem raised a concern at one point in time about her. She went to a criminal hearing. They raised that concern. Thank you. Thank you. Good morning, Your Honors. May it please the court and counsel. Justice Wyckoff, you're correct that this is a case where we do have two competing interests to complete placements, both of which would be good. The trial court made a reasonable decision based on the record and based on the reports before them. Let's leave the child where she is. She's doing fine. To disrupt this placement with the foster family would be detrimental to her. The record is clear that this foster family has been instrumental in the progress she has been making. There's a great bond there and that the child doesn't even want to leave the foster mother for the purpose of going to the therapy. To now say that they're supposed to be separated. One of the things that's interesting to me, Mr. Manchin, is the child is not released from the hospital until October 19th. And by November 5th, the Department of Children and Family Services already decided that the foster family is wonderful and that the child is, they're singing the praises of how the child is already adjusted and that she's doing so well with her physical therapy that it doesn't need to be five days, it can be two days. And I understand, in fact, that may all be true. But a snapshot of a child's life over a two-week period to make a decision which then affects the rest of the child's life appears to me to be, to border on nonsensical. Particularly in regard to, you know, we've got the 90 days, the 180 days, the year, the juvenile, but most often that's with parents who are abusive or neglectful and very rarely are we even confronted with a dependency situation where the speed with which the court system has been asked to operate in regard to very unfortunate children may not have the same application. You're correct, John. This is an unusual situation. But the problem is when the decision, the original decision was made to place it with the Wyckoffs, a decision that has been criticized repeatedly by the intervener and counselor, the intervener was not available to take the child and agreed to this placement with the Wyckoffs. I think Mr. Novick has suggested a reason why she either might not have been available or might not have been the best placement immediately. Yeah, but she also says she couldn't do it because of financial concerns at the start of these proceedings. So to say that this whole thing must fall because the original placement decision was wrong is mistaken. No, I'm not suggesting that the original placement decision was wrong. I'm suggesting that once the original placement decision was made, in something like a two or two and a half week period, you can see the wheels turning such that DCFS is probably not going to, I mean, the implication is they're not going to back up because they've had success in making a placement. Well, success in making a placement is not the standard. Well, the standard is also not what's best for Grandma, which is where the focus of her argument has been, that I am the only one that's qualified. I'm the one being cut out of the loop. I'm more qualified than any of the counselors who I don't know. It's all I, I, I. Well, except that even if Grandmother was not a placement possibility, what possible reason could there be in not viewing her with the child, interviewing her extensively regarding her contact? I take it that the record is not disputed regarding the amount of time that she had spent with the child, the connections with the child, the weekends, the holidays, that sort of thing. That is not disputed, no, Your Honor. Well, then, I mean, it's as if a police officer investigating a crime decides not to interview the most important witness or something. One thing that's been, there's been accusations about the inadequacy of the interview or the initial assessment. We're not talking about inadequacy. We're talking about it didn't happen. But there's also been no claim that the assessment is incorrect, that the information in that assessment report is incorrect, that the DCFS got it wrong, that the information is wrong, that maybe they didn't, maybe they should have interviewed her more, maybe they should have interviewed the family more. But the information that is in that assessment is accurate. There's no claim that that assessment information is not accurate, wherever it came from. There's no claim that that information is inaccurate. It's just that we should have, the DCFS should have done more in contacting grandmas, getting background on the child, or whatever. Now, this was a December 10 dispositional hearing, is that right? I believe that's correct. I believe that's correct, Your Honor, yes. And did the petitioner here appear and participate in that proceeding? In the initial stage of the proceedings, the only family member that appeared was Nicole, the sister. Then she withdrew from the case, the child was placed with the Wyckoffs, and then there's an intervention. And that was prior to the December hearing? I believe that was shortly before. Well, it actually was still in October. And before this preliminary report on November 5th, the petition to intervene was filed contemporaneously with the supplemental petition, and that was within 10 days or so after the child was released from the hospital. That's correct. And that was also after the placement? Yes. So as you had mentioned earlier that, I guess she's the respondent here, the appellant at first wasn't ready to become the custodial parent? Correct. She communicated that to DCFS? Correct. When was that? According to the reports and records, they talked with her, and she agreed to the placement of the Wyckoffs so that she couldn't do it because of financial concerns. When was that? I don't know. This was all in the October 29 disposition reports. I don't recall the date of the discussion. Was it just financial concerns or the fact of the deaths of the people involved? I could see that. That could cause some problems, but what she told DCFS was it was the finances. And when did her stated position on that change, according to the records? I guess it changed when she filed her motion to intervene. October. So I don't recall from the record the date of the conversation, but it would have had to have been before the placement with the Wyckoffs and before. So I really don't know. But the initial placement was done by agreement, and then after that she decides to get involved. So we're talking just the next couple of weeks. Yes, correct. But again, it goes to the question of, you know, she's so committed, so involved, so much with the child. Why is she not involved from the very get-go? I don't know. Maybe because her other grandchildren have been murdered. Within weeks before that, that could have some impact. It could have some impact, but then you get to the position where the court has this before, and what decision does he have to make? He's got information that whatever mistakes were made in placing with the Wyckoffs, whatever mistakes were made in doing the assessments, everything is going well with this child. And the evidence is that to remove this child would be detrimental to her. So the decision to leave her, leave the status quo as is at this point, was, I think, a reasonable decision on the part of the trial court. It reminds me of, and I can't envision this case, could be more like something on Lifetime, where the first person the child clings to is a nurse, who she doesn't know and has never seen before, but is the first person that has extended kindness to her when she awakens after this family tragedy. And then somebody decides within a 24- or 48-hour period, that's the best placement for the child, not only for today and tomorrow, but forever. Well, the decision here was not forever. It was just the dispositional order. This is not the final. Well, I beg to differ. Wasn't there a degree of finality to the order, and only when a motion to reconsider was filed was a certain portion of it vacated? Well, I don't recall. I think you're correct. Someone was urging the trial court to act with a greater degree of speed than appeared to be necessary. And then on reconsideration, he backed up from that. You're correct. But he did back off from that, so that it is not final and end of the story that this is where the child is going to be for the rest of her life. Because that decision is yet to be made. And whatever evidence presented then is what will be decided upon. The grandmother or the intervener has not been cut out of the child's life. And if she wants to help with the child's progress, she can. The evidence was that they were arranging visitation as best they could given the busy schedules of the families involved. The fact that she was kept out of the loop was not entirely the fault of DCFS. There was also the problem with the prosecutor in the criminal case wanting to keep information limited and not wanting the information to somehow seep from grandma or the sister to any of the potential suspects. What does the record show about any connection between the accused and the respondent intervener here? From my recollection, the only thing that was said in this record as to the very start that they even looked at Nicole and grandma as potential suspects at first. That's my recollection of the record. I don't think the record shows whether there's any connection between her and the suspects other than whatever relationship would have developed with them through their marriage to Nicole. You tried to view this case generously from the position of the state. How many people were murdered in this case? I believe it was five. These were all family members, including some children? Yes, the two parents, three children, and Tabitha was almost killed. And there was a sense that this was, from the beginning, from the police or the prosecutor's point of view, somehow family connected? That's my recollection of this record. And one of the people charged is family related in some fashion? Correct. So they weren't sure how far this connected at the beginning? Correct. At the same time, certainly this crime occurred in September, didn't it? I believe so, yes. By 30 or 45 days or 60 days later, they had pretty well formed an idea of who did what and what the connections of anybody were or were not, didn't they? This record doesn't really show. Going outside the record, they probably did. I don't personally know because it's not in the record. I think the three of us understand the realities of a criminal investigation, but I have a difficulty with a veiled prosecutor, whether it's the attorney general or a special prosecutor, somewhere behind the scenes intimating that there might be problems, so be careful with the placement that you make. That ought to be of record. If it is a legitimate concern, it ought to be of record. But instead it is not, and we are left with inference upon inference. That's correct. It appears that we know now that those inferences at least as related to this intervener respondent have evaporated. Correct. The state's argument is not that the intervener would not be a potential placement down the line or that had she been willing and available that she could have been the original placement. That's not our argument. The argument is that faced with the situation before him, the trial court's decision was not of use of discretion. She, as Justice Connick pointed out, she had trauma of her own to deal with given the circumstance of who was murdered here. Is my understanding correct that while this child was in the hospital she didn't visit the child? The record shows that both the foster parents and Nicole and this grandmother were visiting. Oh, they did? Yes. The foster parents at this point weren't yet foster parents? They were not foster parents, but the record shows that Mrs. Wyckoff was as involved or at the hospital as much as the intervener, from my recollection of records, that she was there on a regular basis. And the Wyckoffs were identified as to be the first or to be the foster placement, and at that point no one objected? No one objected and the intervener agreed to the placement, so yeah, that's fine. You talk about she was concerned about her finances, whether she could do it. How did this come up? Was she tendered the opportunity and said, no, I can't do that because of finances, or what? The DCFS report, the October DCFS report, indicates they spoke with her, and it's, let me see if I can find the page of the record. It was on Volume 1, C23, where they talk about why they placed it with the Wyckoffs and their discussions with, and I read my, Go ahead. At this time the appellant stated she needed to work because she needed the money. She said she could take three months off under the Family Relief Act, but would be without income during that time. But would be with what? Without income during that time. Is the foster mother a stay-at-home mom? That is correct. The DCFS report said the Wyckoffs were chosen because of her relationship with the family, because Wyckoffs had the diligence in visiting within the hospital, because she was a stay-at-home mom who could meet all of Tavis' needs. Who transtituted the household of the respondent here? Just she? Just she. And she was working? Correct. So if she were the custodian, she'd have to get somebody else to, during the day, cover for it? Correct. Take care of the child when she was working? Did that come up? I don't recall what it said about how she raised her children or whether she was a working mom when she was raising the respondent. Did she testify at the dispositional hearing? The respondent? The intervener? Yes, she did testify. Did she describe what the household situation would be like if she were the custodian? She testified that she's got a flexible schedule and she can work around it as far as working different hours to try to be more available, but she did not say what would happen on the time when she would be working. And your testimony showed at that time her household was just she? From my recollection, yes. Why does the record show the kinds of needs this child has or had at that point? At this point, she still needs the physical therapy, the occupational therapy, the counseling, speech therapy, all of what she's getting in her current placement. What were the injuries she suffered in this attempt? She had a, I believe it was a fractured skull. She received tremendous head injuries. They're worried about her? Possibly brain injuries? Possibly brain injuries and just dealing with trauma of having lost her family. And she's receiving therapy for that. The testimony is that the White Cops are taking her regularly to the therapy that is being provided through Easter Seals. Is there anything in the record about the need for, for lack of a better way to put it, stability and continuity in these specialized services that she was receiving, not just from counselors and therapists, but in her home environment? Well, the Easter Seals report and the Lisa Schwab's clinical treatment report both say, and I see 73 in the record, volume 1, Schwab's opinion in the relationship between Tabitha and her foster family is critical to her and any disruption of this relationship would be detrimental. But does it say what they were doing with her? Is this, in other words, I'm no therapist and I don't understand this stuff. Is there something on a day-to-day basis which is complementary to what the therapists are doing that the custodian or foster mother, let's say, who's a stay-at-home mom is able to do on an ongoing basis? It does say that the therapy is provided in the White Cops' home. The record also shows that, let's see, I believe it was the, I'm trying to see which report it was. The Easter Seals report says that the foster family has been a significant factor in Tabitha's progress and instrumental carrying over techniques into daily life, making improvements more pronounced. One last question. Who else constituted the foster family home besides the parents and Tabitha? There is a child who shares the room with Tabitha who she's become very attached to. How old? I don't recall the exact age, but I believe they're about the same age. Well, there's a 10-year-old adopted daughter, but I don't know if that is the same person. I don't know if there are other children in the home, given that these folks are licensed foster parents for separate and apart from the placement of this child. Okay. Thank you. Thank you. Mr. Norwick, does the record show where these services are provided? And it's the Easter Seals people out of Bloomington? Yes. And it's the counselor out of Bloomington? I think the counselor is out of Peoria, Your Honor. Okay. So the child, in order to receive these services, is driven from Piper City? Yes, Your Honor. Versus being driven from somewhere else if the respondent was the placeholder? Correct. What does the respondent live? Lincoln. One of the questions you asked before was, even if the IA was inadequate, was it incorrect? And the answer is emphatically yes. We had a short period of time to read it. We found three things that were absolutely incorrect, and if someone had just asked the grandmother, they could have been disclosed. The assessment pointed out that the child was afraid of the dark, and it must have been the result that this happened at night, the murder happened at night, and that was caused it. The child had always been afraid of the dark. That's what Ms. Fagel testified to. She had some issues there. One of the issues was that the child seemed to be playing with dolls aggressively, and that must have been the result of the tragedy. Foster grandmother testified that she's a tomboy. She had older brothers. She was a rough kid. She always played with dolls aggressively. One of the things in the assessment was the child seems to be unduly shy, and that's the result of the murders. No, Ms. Fagel testified, this had been a shy child. If you had just talked to the grandmother, there would have been good case work. You would have been able to help this child a whole lot more. The question was asked, was grandma not that involved with visitation? There were two people initially who were allowed to see the child unsupervised, and one of them was grandma, not the foster parents. Once DCFS took over, it switched. Only the foster parents were allowed to see the child. How is it that the person who ends up becoming the foster mother is permitted to visit this child in the hospital given the state's concern about this child as a potential witness and, of course, the child's well-being and condition? I mean, if you or I showed up to visit a child who was the victim of an attack when the rest of her family was killed, and we said, I used to be married to somebody who used to be a part of this family, how does that happen? The answer to the question is either a lack of candor on somebody's part or a lack of follow-up on somebody's part. If you look at all the common law record, you will see nowhere where it says that the foster parents never met the child before. They're constantly referred to as aunt and uncle. There's a lack of candor somewhere there, and I can't tell you how many I've had in juvenile court where a parent fails to disclose that they have a secret new boyfriend or girlfriend, where a parent testifies, I'll test negative, and they don't, where a parent has a domestic violence incident and they don't disclose it. The trial court and the appellate court goes, there's been a lack of candor here, and for some reason we can't trust you. Well, Your Honors, there has been a lack of candor, and it's either from the foster parents or it's on DCFS's side, or DCFS didn't even ask the question, did you know the child? I can't tell from the documents there. Let me ask, counsel, you heard my questions about the home of your client and also of Wyckoff's. What was the situation regarding your client at the dispositional hearing? Was her household consistent? Herself. If she had been made custodian, how would she have taken care of the child? She had a flexible schedule. She was only working part-time in the first place. She could have gotten the child to all the services the child needed to have gotten to. That's what she testified to. And when she was working, what would have happened then? She would have had to have gotten a relative or a daycare situation trial. If I'm the trial judge, why would I think that that would be a better situation for this child than the situation with the stay-at-home mom who is literally 24 hours a day there? The stay-at-home mom was a farm family. There was a lot of rain last year. They had a lot of issues with the farm. I don't know that it would have been a whole lot different. They were a working family. I'm not saying anything bad against them. They're nice folks. They were a working family. I'm not sure I understand your answer. There's a farm wife. She has other duties as assigned. That was clearly in the IA. The report that Mr. Manchin read regarding this conversation that someone had with the respondent intervener about her, maybe I could take family leave act for three months, whatever. Is the date of that in the report? And does the report indicate who it was that talked to the grandmother? Or is it just they? I don't believe so. And is it accurate that it's also mentioned in that report or elsewhere in the record that when this was discussed with her she said, I am interested in guardianship, I'm interested in adopting, and I'm making an appointment with an attorney to talk about this, but I have no objection to this immediate, this short-term place, this immediate place. She was told by DCFS, don't worry, Judy, this is a short-term thing. That's in the record. Did she testify at the dispositional hearing about her concerns about finances? At least initially what her concerns were? She said she had no concerns. She had a job. She had some savings. She had a little bit of real estate. She could get it done is what she testified to. Well, what about initially? Did she dispute the testimony? Did she express financial concerns at one stage? She did. She disputed that? She did. Did anyone testify contrary to that or to rebut her? There were only two witnesses that testified at DISCO. The first was the child's teacher who talked about the relationship she had with one of the dead children and the relationship she had with T.G. and Judy Stockdale. What did your client say about the claims of her financial concerns? She said that she had no financial concerns about caring for this child. I'm trying to understand. Was it a lie or was it a misunderstanding that someone thought earlier that she did? What did she say? She said she had a job. She said she had real estate, and she said she had enough savings. She mentioned a few stocks that she could care for the child. Did she explain why the reporter, the DCFS person, might have thought that there was a reference to financial concerns? Never confronted with that. I think Judge Feeney's heart was in the right place. He looked at a horrible situation. He looked at what must have been a lot of services for the child, and he said, just as the state's attorney said, let the state of Illinois take care of it. We've got a bad budget situation. Let the state of Illinois take care of it. It's only going to be short term. Anything further? No, Your Honor. Thank you. This case is a matter under advisement.